In the Interest of R.W.

No. 2–03–188–CV.

Court of Appeals of Texas,
Fort Worth.

Feb. 5, 2004.

Marc F. Gault, Fort Worth, for Appellant.

Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of the Appellate Division, Sharon A. Johnson, Cindy M. Williams, and Melissa Paschall, Asst. Crim. D.A.'s, Fort Worth, for Appellee.

Panel A: CAYCE, C.J., LIVINGSTON and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

This is an appeal from a judgment rendered on a jury verdict terminating the parent-child relationship between Appellant B.B.[1] and his daughter, R.W. In three points, B.B. contends that the evidence is legally and factually insufficient to support any of the statutory grounds for termination pleaded by the Texas Department of Protective and Regulatory Services ("TDPRS"). He also contends that the trial court erred by denying his no-evidence motion for summary judgment because TDPRS failed to produce any evidence to support termination of B.B.'s parental rights based on section 161.001(1)(E) of the Texas Family Code. We will affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

In July 2001, B.B. began a four-month relationship with R.W.'s mother, Rhonda W. Approximately six weeks into the relationship, Rhonda discovered that she was pregnant. However, according to both Rhonda and B.B.'s testimony at trial, neither party believed that B.B. was R.W.'s father because a doctor had miscalculated Rhonda's conception date. Therefore, both parties presumed that R.W.'s father was Rhonda's prior boyfriend, Robert W. Nevertheless, during the remainder of the couple's relationship, B.B. provided food and care for Rhonda and demonstrated an intent to treat R.W. as his biological child. In November 2001, Rhonda ended her relationship with B.B. and resumed her relationship with Robert. According to Rhonda's testimony at trial, although B.B. tried to remain supportive of her and R.W. after the break-up, she continually pushed B.B. out of her life by constantly reiterating that R.W. was not his child. Thereafter, pursuant to Rhonda's request, B.B. ceased all contact with her.

R.W. was born on April 28, 2002. Due to Rhonda's past history with TDPRS, R.W. was removed from Rhonda's care almost immediately after birth and was placed in foster care. On April 30, 2002, TPDRS filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent–Child Relationship, alleging Rhonda as R.W.'s mother and Robert as R.W.'s father. However, paternity tests later revealed that B.B. was the actual biological

---

1. To protect the privacy of the parties involved in this appeal, we identify them by initials or first names only. *See* TEX. FAM.CODE ANN. § 109.002(d) (Vernon 2002).

father of R.W. As a result, on June 26, 2002, TDPRS filed a first amended petition to terminate the parent-child relationship between B.B.[2] and R.W., alleging that termination was sought based on sections 161.001(1)(D), (E) and (N) of the Texas Family Code and the best interest of R.W.

On January 8, 2003, B.B. filed a Statement of Paternity, acknowledging himself as the biological father of R.W. Thereafter, on February 6, 2003, B.B. filed a no-evidence motion for summary judgment, alleging that TDPRS had failed to produce any evidence to support termination of B.B.'s parental rights based on the grounds provided. Although TDPRS never specifically responded to B.B.'s motion, TDPRS subsequently amended its petition by removing section 161.001(1)(F) as an alleged ground for termination of B.B.'s parental rights and by adding section 161.001(1)(H). After a hearing, on March 24, 2003, the trial court denied B.B.'s no-evidence motion for summary judgment.

On April 23, 2003, trial commenced before a jury. After hearing testimony from both sides, the jury found that B.B.'s parental rights should be terminated because B.B. had violated sections 161.001(1)(E) and (H) of the Texas Family Code and termination was in the best interest of R.W. Accordingly, on May 1, 2003, the trial court entered an order terminating B.B.'s parental rights to R.W. This appeal followed.

## III. BURDEN OF PROOF IN TERMINATION PROCEEDINGS

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745,

758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *accord Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, states, "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). In a termination case, the State seeks to end parental rights permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM.CODE ANN. § 161.206(b) (Vernon Supp.2004); *Holick*, 685 S.W.2d at 20. Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, TDPRS must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs.*

---

**2.** The petition also sought to terminate the parental rights of R.W.'s presumed father, Samuel W. However, on April 7, 2003, Samuel W. was removed from the suit after being excluded as the father of R.W.

*v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 746, 102 S.Ct. at 1391; *see also* Tex. Fam.Code Ann. § 161.001.

■ Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007; *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex.2002); *C.H.,* 89 S.W.3d at 25. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979); *In re D.T.,* 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick,* 685 S.W.2d at 20–21; *In re A.V.,* 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

## IV. Sufficiency of the Evidence

In his first two points, B.B. complains that the evidence is legally and factually insufficient to support the jury's findings that he: (1) engaged in conduct or knowingly placed R.W. with persons who engaged in conduct that endangered her physical or emotional well-being and (2) voluntarily, and with knowledge of the pregnancy, abandoned Rhonda beginning at a time during her pregnancy with R.W.

and continuing through the birth, failed to provide adequate support or medical care for Rhonda during the period of abandonment before the birth of R.W., and remained apart from R.W. or failed to support R.W. since the birth. *See* Tex. Fam. Code Ann. § 161.001(1)(E), (H).

### A. Standard of Review

■ The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing evidence burden of proof in termination proceedings. *J.F.C.,* 96 S.W.3d at 264–68 (discussing legal sufficiency review); *C.H.,* 89 S.W.3d at 25 (discussing factual sufficiency review). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the supreme court has held that the traditional legal and factual standards of review are inadequate. *J.F.C.,* 96 S.W.3d at 265; *C.H.,* 89 S.W.3d at 25. Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a trier of fact could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *J.F.C.,* 96 S.W.3d at 265–66; *C.H.,* 89 S.W.3d at 25.

■ Accordingly, in reviewing the evidence for legal sufficiency in parental termination cases, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.,* 96 S.W.3d at 266. In conducting our review, we must disregard all evidence that a reasonable trier of fact could have disbelieved; however, we must consider undisputed evidence even if it does not support the finding. *Id.* If, after conducting

our review, we determine that no reasonable trier of fact could have formed a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally sufficient. *Id.*

■■■ In determining a factual sufficiency point, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child's best interest. TEX. FAM.CODE ANN. § 161.001; *C.H.*, 89 S.W.3d at 25. In reviewing the factual sufficiency of the evidence, we must consider all the evidence in the record, both that in support of and contrary to the trial court's findings. *C.H.*, 89 S.W.3d at 27–29. Additionally, we must consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is of such magnitude that a trier of fact could not reasonably have formed a firm belief or conviction that its finding was true, then the evidence is factually insufficient. *Id.*

**B. Evidence Regarding Endangering Course of Conduct**

■■ We first review the evidence supporting the jury's finding that B.B. engaged in conduct or knowingly placed R.W. with persons who engaged in conduct that endangered R.W.'s physical or emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(E). B.B. contends that termination was not proper based on section 161.001(1)(E) because he never had custody of R.W. at any time after her birth other than one hour of supervised visitation per week. Moreover, he maintains that remote and isolated incidents that occurred prior to R.W.'s birth do not constitute sufficient evidence to establish an endangering course of conduct. TDPRS maintains, however, that B.B.'s history of substance abuse, mental health issues, and sexual and criminal misconduct clearly demonstrates an endangering course of conduct that posed both physical and emotional danger to R.W.'s well-being.

■■■ Under section 161.001(1)(E) of the Texas Family Code, the term "endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533. Accordingly, when analyzing a jury's findings pursuant to subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.M.*, 58 S.W.3d 801, 811–12 (Tex.App.-Fort Worth 2001, no pet.). Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM.CODE ANN. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id.*

■■■ To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *D.M.*, 58 S.W.3d at 812. Further, a father's conduct prior to the establishment of paternity may be considered as evidence of an endangering course of conduct. *In re M.D.S.*, 1 S.W.3d 190, 198 (Tex.App.-Amarillo 1999, no pet.); *see*

*also In re Stevenson,* 27 S.W.3d 195, 202 (Tex.App.-San Antonio 2000, pet. denied) (emphasizing that knowledge of paternity is not required in order for parental rights to be terminated under section 161.001(1)(E)). Consequently, scienter is only required under subsection (E) when a parent places the child *with others* who engage in an endangering course of conduct. *In re U.P.,* 105 S.W.3d 222, 236 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (op. on reh'g).

▮▮▮▮▮▮▮ As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *Dupree,* 907 S.W.2d at 84. Further, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re J.I.T.P.,* 99 S.W.3d 841, 845 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *In re C.D.,* 664 S.W.2d 851, 853 (Tex.App.-Fort Worth 1984, no writ). Threats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being. *See In re A.M.C.,* 2 S.W.3d 707, 716 (Tex. App.-Waco 1999, no pet.). Evidence of sexual abuse of another child, coupled with a present or future danger to the child in question, is also relevant to determine whether a parent has engaged in an endangering course of conduct, even if the abuse occurred prior to the birth of the subject child. *See K.M.M.,* 993 S.W.2d at 227–28. Moreover, evidence of an inappropriate sexual relationship with a minor

may also be considered in determining if the parent engaged in conduct that endangered the emotional or physical well-being of the child. *See M.D.S.,* 1 S.W.3d at 199.

**1. Substance Abuse and Mental Health Issues**

In the present case, TDPRS points to B.B.'s history of substance abuse and mental health issues as evidence of endangering conduct. The evidence demonstrates that B.B. continuously struggled with alcohol and drug abuse throughout the years prior to R.W.'s birth and that B.B.'s substance abuse often contributed to mental instability, including both psychosis and suicidal ideations. At trial, B.B. testified that he had often consumed excessive amounts of alcohol over the years. B.B. also admitted to previously using and selling crack-cocaine and marijuana. Moreover, the record contains volumes of medical records documenting numerous occasions between 1999 and 2002 where B.B.'s substance abuse and/or mental instability was so excessive that he required medical assistance or intervention.

Specifically, in April 1999, B.B. was admitted to Trinity Springs Pavilion ("T.S.P."), an in-patient psychiatric emergency center, because he was suffering from hallucinations based on his daily use of alcohol. B.B. confessed that spirits were telling him to kill himself, that he had previously attempted suicide on at least two occasions, and that he also was having thoughts of killing his stepfather.

Approximately three months later, B.B. was again admitted to T.S.P. for psychiatric treatment after suffering from suicidal ideations. During a psychiatric assessment, B.B. reported that, prior to admission, he was consuming approximately twelve beers and a pint of vodka per day and planning to kill himself by cutting his wrists, drowning himself, hanging himself,

or poisoning himself. He also stated that he had attempted to commit suicide several times over the previous year and he often heard voices that encouraged him to kill himself. B.B. was diagnosed with a severe mood disorder caused by alcohol abuse.

Thereafter, in February 2000, after being released from the Billy Gregory Recovery Center earlier in the day, B.B. visited the emergency room at John Peter Smith Hospital ("J.P.S.") after consuming large quantities of beer and cocaine, complaining that he was "drunk and stoned" and that he was afraid that he might hurt himself. In March 2000, B.B. threatened to kill himself with a cross-bow and was once again taken to J.P.S. for psychiatric treatment. B.B. later admitted that he was depressed because his girlfriend had left him, and as result, he drank a case of beer, snorted cocaine, smoked heroin, took both Xanax and muscle relaxants, and planned to commit suicide.

Less than three months later, B.B. was taken by the police to the Tarrant County Hospital District Psychiatric Emergency Center ("P.E.C.") after claiming that he wanted to commit suicide. B.B. later reported that he had consumed approximately thirty 40–ounce beers and seven to eight gallons of liquor in the previous week. In the month of June 2001, B.B. visited the P.E.C. five times for depression and suicidal ideations, wherein he admitted to consuming large quantities of alcohol prior to each visit.

In November 2001, after his break-up with Rhonda, B.B. sought treatment at J.P.S. on two occasions for substance-induced depression, hallucinations, and suicidal ideations. Less than one month later, B.B. called 9–1–1 complaining of suicidal ideations and was taken to the Osteopathic Medical Center of Texas, where he told the staff that he had pre-viously purchased four Vicodin on the street in order to kill himself. Shortly thereafter, in January 2002, B.B. visited J.P.S. after threatening to stab himself with a knife because of a fight with his girlfriend.

In February 2002, B.B. was taken by emergency personnel to Parkland Hospital in Dallas, Texas, after complaining of depression and suicidal ideations. B.B. subsequently told the Parkland staff that he had gone to Dallas to be near his sixteen-year-old "sister" who was at Buckner Children's Home and that he and his "sister" could communicate telepathically. According to the staff, B.B. appeared obsessed with the idea of being near his "sister."

In June 2002, shortly after R.W.'s birth, B.B. again threatened to commit suicide and was taken by the police to J.P.S. for a psychiatric assessment. There, B.B. reported that he had consumed large amounts of alcohol and crack-cocaine. He later admitted that he became angry and depressed because his girlfriend would not let him see his child and that he wanted to hurt his girlfriend's ex-boyfriend.

As previously reflected, B.B.'s course of conduct, throughout the years prior the establishment of his paternity to R.W., demonstrated a pattern of substance abuse and mental instability. However, B.B. contends that the evidence is insufficient to show a course of conduct that indicates a present or future danger to R.W.'s well-being, because he has not abused alcohol or drugs or required psychiatric treatment since becoming involved in this case. In response, TDPRS argues that B.B.'s extensive history of substance abuse is not rendered insufficient to establish an endangering course of conduct, merely because B.B. improved his behavior a few months prior to trial.

At trial, B.B. maintained that he had no recollection of most of his hospital visits. However, he did not deny that any of the visits occurred, nor did he challenge the validity of any of the medical records. He testified that he was not concerned about his well-documented history of prior suicide attempts and ideations when considered with respect to raising R.W. because he was no longer bothered by depression and all of the incidents reflected in the records were based on his past conduct.

During the hearing B.B. also maintained that he had not consumed any alcohol for at least seven to eight months prior to the termination hearing, nor had he used any drugs during the prior seven to eight years. Tonyia Brown, the TDPRS caseworker assigned to R.W.'s case, admitted that after B.B. was determined to be the father of R.W., he had submitted to random drug screens and had tested negative for drug use. Nonetheless, the record contains some evidence indicating that B.B.'s substance abuse was more than a remote problem in his past. For example, the aforementioned medical records presented by TDPRS show that B.B. admitted to using drugs until at least a year before the termination hearing. In addition, Elvia Smith, a TDPRS witness, testified that she believed that B.B. was still abusing alcohol because, on the Saturday prior to the termination hearing, she saw B.B. at his mother's home and he was intoxicated. Moreover, at trial, B.B. denied that he needed treatment to combat his history of substance abuse. He maintained that he had voluntarily decided to stop using alcohol and drugs when he found out he was R.W.'s father. However, he admitted that he had refused to attend counseling to help him remain alcohol and drug-free, even

though a recent substance abuse assessment recommended that he receive treatment four to five times a week. He also testified that he did not believe he needed any treatment or medication to deal with his mental disorder.

The record contains a significant amount of evidence reflecting that the substance abuse and mental instability in B.B.'s past constituted more than just "remote and isolated incidents." Despite B.B.'s contention that he had stopped drinking, using drugs, and being depressed prior to his involvement with this case, the jury was not required to ignore a long history of dependency and destructive behavior merely because it allegedly abated before trial. *See In re M.G.D.*, 108 S.W.3d 508, 513 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Moreover, the evidence at trial reflected that B.B. failed to appreciate the need for treatment to combat his history of substance abuse and mental instability. Therefore, the jury could infer that B.B.'s substance abuse and mental health issues would likely recur and further jeopardize R.W.'s well-being.

## 2. Allegations of Sexual Misconduct

TDPRS also points to allegations of prior sexual misconduct as evidence of conduct that endangered R.W.'s well-being. In December 1995, Smith, a family friend, left her five-year-old daughter, A.H., home with B.B. and two other infants while she went to the grocery store. After Smith arrived back from the store, A.H. told her that B.B. had been "naughty" with her. According to Smith, A.H. accused B.B. of rubbing her bottom, showing her pornographic magazines, and asking her to either suck or touch his penis.[3] Smith testified that, after her daughter told her what

3. Smith testified at trial that she was unsure as to whether A.H. had told her that B.B. asked her to suck or to touch his penis. How-

ever, she stated, "I believe it was to suck his penis."

had transpired, she immediately contacted the Hurst Police Department to report the sexual abuse. Smith maintained that she was certain A.H. was telling the truth about the sexual abuse. Nonetheless, according to Smith, no criminal charges were ever filed against B.B. in connection with her daughter's allegations because the Hurst Police Department lost the videotape containing A.H.'s outcry statement.

Vincent Pancaldo, a former sexual abuse investigator for TDPRS, conducted a videotaped interview with A.H. shortly after the alleged abuse occurred. During the interview, A.H. told Pancaldo that B.B. had rubbed her clothing in both her vaginal and buttocks areas, placed her hand on his penis, performed oral sex on her, and warned her not to tell anyone. A.H. also reported that she had previously been sexually abused by a relative. According to Pancaldo, after taking a short break during the interview, A.H. came back, said that she had told him a lie by accident, and began crying and telling him that she thought she was going to get into trouble. However, he maintained that it was normal for young children that are scared of disclosing sexual abuse to want to recant their stories. Thereafter, Pancaldo testified that based on the spontaneity of A.H.'s original description of the abuse, he believed her outcry to be true. He stated that, after a full investigation into the allegations, he determined that there was "reason to believe" that B.B. had sexually abused A.H.

Both prior to and during the termination hearing, B.B. denied that he sexually abused A.H. However, Laura Greuner, a therapist and licensed clinical practitioner dealing with parenting and substance abuse issues, testified that she was concerned after discussing A.H.'s allegations with B.B. She reasoned that although B.B. had told her he did not sexually abuse A.H., he maintained that A.H. had tried to come on to him by attempting to give him an open-mouth kiss. According to Greuner, B.B.'s response fit the profile of a sex offender because sex offenders often characterize children as being seductive toward them as a way to justify their behaviors. Gruener testified that in light of the "reason to believe" case involving A.H., she could not recommend giving R.W. to B.B. until he completed a sex offender screening and received any necessary treatment. At trial, B.B. admitted that he had failed to complete a sex offender evaluation even though it was required under his TDPRS service plan, reasoning that he lacked the financial resources to pay for it.

■ B.B. claims that evidence of a dubious allegation of sexual abuse that occurred seven years prior to the termination suit is insufficient to establish an endangering course of conduct. However, "it is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re R.G.*, 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.), *disapproved of on other grounds*, 96 S.W.3d 256 (Tex.2002); *see also In re King*, 15 S.W.3d 272, 276 (Tex.App.-Texarkana 2000, pet. denied). Accordingly, evidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children. *See K.M.M.*, 993 S.W.2d at 228; *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678–79 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.).

■ As the exclusive trier of fact, the function of the jury is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). Therefore, despite B.B.'s contention that the al-

legation of sexual abuse was dubious, the jury was free to believe that B.B. did in fact sexually abuse A.H., particularly in light of his failure to complete a sex offender evaluation. Moreover, based on the nature of the alleged misconduct, the jury could infer both a present and future danger to R.W.'s well-being.

Further, as reflected in the record, some evidence exists indicating that B.B. also engaged in an inappropriate sexual relationship with M.R., a sixteen-year-old girl. At trial, B.B. testified that he met M.R. in 2001, while living at a night shelter. B.B. admitted that he and M.R. later started a relationship; yet, he claimed that she had lied to him about her age. M.R. was subsequently placed in foster care, but ran away to be with B.B. in March 2003. While B.B. acknowledged that he should not have engaged in a sexual relationship with M.R. when she was underage, he maintained that all relations ceased when he found out her true age. He admitted that M.R. was living with him at his mother's home approximately one month before the termination hearing, but he claimed that they were no longer engaged in a relationship.

### 3. Criminal History

TDPRS also references B.B.'s criminal history as evidence of an endangering course of conduct. In 1990, B.B. was convicted of the felony offense of burglary of a building and was sentenced to five years of probation. However, in 1992, B.B.'s probation was revoked because he failed to report to his probation officer as required by the terms of his probation; therefore, he was sentenced to three years' imprisonment.

Thereafter, in 1996, B.B. was convicted of the felony offense of delivery of a controlled substance. For that offense, B.B. received a sentence of two years that was probated for five years. As part of his probation, B.B. was required to spend four months in a drug treatment facility and to refrain from the illegal use of controlled substances. However, less than a year later, after B.B. was released from treatment, he tested positive for cocaine. As a result, B.B.'s probation was revoked and he was sentenced to fifteen months' imprisonment.

In May 2002, less than a year before the termination hearing, B.B. was arrested for misdemeanor theft. B.B. subsequently pled guilty and was sentenced to twenty days' confinement in the Tarrant County Jail. However, at trial, B.B. denied having any knowledge of this conviction.

██ Imprisonment alone is insufficient to show a continuing course of conduct that endangers the physical or emotional well-being of a child. *Boyd,* 727 S.W.2d at 533. However, it is a fact properly considered on the issue of endangerment. *Id.* at 533–34; *D.T.,* 34 S.W.3d at 635–36. Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, a finding under section 161.001(E) is supportable. *Boyd,* 727 S.W.2d at 533–34. Therefore, while B.B.'s criminal history and resulting imprisonment, standing alone, is insufficient to support the jury's endangerment finding, when considered in conjunction with the evidence concerning B.B.'s history of substance abuse, mental instability, and sexual misconduct, such evidence provides further proof of a voluntary, deliberate, and conscious course of conduct that endangered R.W.'s well-being.

We have carefully reviewed the entire record. Looking at the evidence in the light most favorable to the jury's finding, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed

a firm belief or conviction that B.B. engaged in conduct that endangered R.W.'s physical or emotional well-being. Accordingly, we overrule B.B.'s second point.

Because we have concluded there is both legally and factually sufficient evidence to support the jury's findings under subsection E, we need not address B.B.'s first point regarding the sufficiency of the evidence under subsection H. Only one finding alleged under section 161.001(1) is necessary to a judgment of termination. *D.M.*, 58 S.W.3d at 813; *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); *see also* Tex.R.App. P. 47.1.

### V. No-Evidence Motion for Summary Judgment

In his third point, B.B. contends that the trial court erred by denying his no-evidence motion for summary judgment. Specifically, he argues that summary judgment was proper because TDPRS failed to produce any evidence to support termination of B.B.'s parental rights under section 161.001(1)(E). TDPRS maintains that a trial court's denial of a motion for summary judgment is not reviewable after a trial has been held on the merits.

As a general rule, appellate courts do not have jurisdiction to review on appeal the denial of summary judgment. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex.1966); *Hines v. Comm'n for Lawyer Discipline*, 28 S.W.3d 697, 700 (Tex.App.-Corpus Christi 2003, no pet.). In fact, where a motion for summary judgment is denied by the trial court and the case is thereafter tried on its merits, the order denying the motion for summary judgment is not reviewable on appeal. See *Ackermann*, 403 S.W.2d at 365; *Horton v. Horton*, 965 S.W.2d 78, 88 (Tex.App.-Fort Worth 1998, no pet.).

While a no-evidence motion for summary judgment differs in some respects with the traditional motion for summary judgment, the comment to Rule 166a(i) states that the denial of a no-evidence motion for summary judgment is no more reviewable by appeal or mandamus than the denial of a traditional motion for summary judgment. Tex.R. Civ. P. 166a cmt. Therefore, the denial of a no-evidence motion for summary judgment should be treated the same as the denial of a traditional motion for summary judgment. See *Hines*, 28 S.W.3d at 700. Accordingly, we have no jurisdiction to review the trial court's denial of B.B.'s no-evidence motion for summary judgment. Thus, we dismiss B.B.'s third point.

### VI. Conclusion

Having disposed of all of B.B.'s points on appeal, we affirm the trial court's judgment.