COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-056-CV

 

 

IN THE INTEREST OF D.F., A CHILD                                                        

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I. Introduction

In two points, Appellant
David F. complains that the evidence was legally and factually insufficient to
support the termination of his parental rights. 
We affirm.

II. Factual and Procedural Background








On January 25, 2000, Yvonne
F. gave birth to D.F. in North Carolina while married to David.  After she was born, D.F. lived with Yvonne
but spent nearly every day with David until she turned three years old.  While in North Carolina, David was convicted
of two misdemeanors, a 2003 conviction for possession of stolen property and a
conviction in either 2003 or 2004 for the assault of his sister.  David served approximately fifty-five days
for the assault. Further, David admitted that he most likely used drugs in some
capacity during the time that he had contact with D.F. but maintained that he
last used drugs in 2004.

In late 2003, Yvonne gave three of her children, but not D.F., to
foster care in North Carolina.  Around
that same time, North Carolina officials asked D.F.=s godmother, Shelly F., if she would take care of D.F.  D.F. then moved out of Yvonne=s home and in with Shelly for approximately six months before
returning to live with Yvonne.

In 2004, Yvonne filed for divorce from David based on the ground that
they had been separated for at least one year. 
David testified that he and Yvonne were not actually separated but that
he did not contest the allegations because he had no knowledge of the divorce
proceedings.  David stated that he found
out about the divorce in February 2007, only a week before the trial. David
further testified that the couple was officially divorced on May 14, 2004,
after notice was published in the newspaper for three weeks with no response.








Yvonne=s three
children that had been in foster care returned to live with Yvonne in late
2004.  Shortly thereafter, Yvonne left
North Carolina for Texas with all four of her children and her then-boyfriend
Michael J.  David last visited D.F. in
2004 before she left for Texas. 
Eventually the children, except for D.F., came back to live in North
Carolina.  At some point after Yvonne,
Michael, and D.F. moved to Texas, David moved from North Carolina to
California, where in 2005 he was convicted of the felony offense of unlawful
sex with a minor.  The female minor was
seventeen years old at the time of the offense.








On October 31, 2005, Denalyn Allen, a Child Protective Services (ACPS@)
investigator, received allegations of Yvonne and Michael=s neglectful supervision and drug use and initiated an investigation.[2]  Allen investigated the household on November
3, 2005, and found that the house had no electricity and very little food.  She asked D.F. about the alleged domestic
violence and drug use in the home, and D.F. stated that sometimes when her Amom and dad@ would
fight, they would throw things.  D.F.
also told Allen that Michael smoked drugs in a blue pipe that Alooked like clouds.@  Both Yvonne and Michael
admitted to using drugs but failed to take drug tests requested by CPS.  Based on the investigation, CPS placed D.F.
with Michael=s mother;
however, the mother returned D.F. four days later because she was going out of
town and could not take D.F. with her. 
At this time, CPS placed D.F. in foster care.  Subsequently, both Yvonne and Michael were arrested,
apparently for drug-related offenses.  On
November 22, 2005, Texas Department of Family Protective Services (ATDFPS@ or ACPS@) filed a
petition to terminate both Yvonne and Michael=s parental rights.

In either October or November 2005, Michael=s mother contacted David and informed him that CPS had initiated an
investigation regarding Yvonne and D.F.  She also gave him a number to call CPS in
Texas. David initially testified that he found out that ACPS@ had
initiated an investigation of Yvonne but later said that he meant to say that
it was Asocial services@ that had
initiated the investigation.  David
admitted that he did not know whether there was a difference between the two in
Texas and that he Aput it all
the same.@  In response to learning of the investigation,
David tried to call Yvonne=s mother and made one phone call to Dallas County CPS.  He claims that CPS told him that Athey had nothing on [Yvonne]@ and that he made no efforts to locate D.F. because he was Atossed out.@








In August 2006, CPS learned
that David might be D.F.=s father,
and Pamela Gillinger, a CPS caseworker, called David to inform him that D.F.
had been placed in custody of CPS.  David
was still under probation in California for his felony conviction when he found
out that CPS had custody of D.F.  Because
there was some confusion regarding whether David was D.F.=s father, Gillinger asked David to submit to a paternity test.  Although David said that he would submit to
the test, he had failed to do so as of the time of trial.  However, David acknowledged in open court
that he was D.F.=s father.

Gillinger testified that she
also mentioned to David that Aservices@ needed to
be completed but that she never specifically told David about the service plan
that she had created for him.  David
testified, however, that Gillinger never mentioned services during their
conversations.  Gillinger mentioned that
she talked to David a second time in August, but she did not state what was
discussed during that communication.








After the two initial phone
conversations between Gillinger and David, Gillinger attempted to call David in
September 2006 but learned at that time that David no longer had the same phone
number.  David testified that while his
phone number may have changed, his physical address remained the same and that
mail sent to his California address was being forwarded to North Carolina,
where he has been since December 2006. 
Gillinger never spoke with David again until one week before trial in
February 2007, when Gillinger finally made contact with him by phone in North
Carolina.  David stated that he quit
calling Gillinger because she failed to provide him with paperwork that he had
requested.[3]

On August 21, 2006, TDFPS amended its petition to terminate parental
rights to include David as the presumed father. 
In September 2006, after he found out that CPS had taken custody of
D.F., David was charged with possession of methamphetamine in California, and
at the time of trial, there was an active arrest warrant out for David
concerning this offense.  In October
2006, CPS placed D.F. with Pamela F., a dual-licensed foster parent.  In December 2006, after David finished
serving his probation for the felony conviction in California, he traveled by
bus back to North Carolina to visit his other three children.  Although David traveled through Texas on his
way to North Carolina, he failed to make any contact with D.F., who was living
in Texas at the time.








At the bench trial, based on section 161.001(2) of the Texas Family
Code, the trial court found that it was in the best interest of D.F. to
terminate the parental rights of Yvonne, Michael, and David.  See Tex.
Fam. Code Ann. ' 161.001(2)
(Vernon Supp. 2007).  Additionally, with
respect to David, the trial court made the following findings by clear and
convincing evidence based on section 161.001(1):

!                  
David knowingly placed or
knowingly allowed D.F. to remain in conditions or surroundings that endangered
the physical or emotional well-being of D.F;

!                  
David engaged in conduct or
knowingly placed D.F. with persons who engaged in conduct that endangered the
physical or emotional well-being of D.F.; 

!                  
David constructively
abandoned D.F., who has been in the permanent or temporary managing
conservatorship of TDFPS or an authorized agency for not less than six months
and: (1) TDFPS or an authorized agency made reasonable efforts to return D.F.
to David, (2) David did not regularly visit or maintain significant contact
with D.F.; and (3) David demonstrated an inability to provide D.F. with a safe
environment.

David now appeals the trial court=s findings under subsections (1) and (2) of section 161.001 of the
Texas Family Code.

 








III. Waiver

TDFPS argues that David has waived his sufficiency arguments because
he failed to file a statement of points with the trial court.  See
Tex. Fam. Code Ann. ' 263.405(i) (Vernon Supp. 2007). 
TDFPS further argues that David=s motion for new trial does not constitute a valid statement of points
because it is too vague to satisfy the requirement that the statement of points
be Asufficiently specific@ to preserve error for appeal.  See
id.  However, in a recent en banc
decision, this court held that family code section 263.405(i) is void as a
violation of the separation of powers provision of the Texas Constitution.  See In re D.W., No. 02-06-00191-CV,
2008 WL 467328, at *12 (Tex. App.CFort Worth Feb. 19, 2008, no pet. h.). 
We are bound to follow our own precedent, so we hold that David=s sufficiency arguments are not waived and proceed to the merits of
David=s appeal.

IV. Termination of Parental
Rights








A parent=s rights to Athe companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758B59, 102 S.
Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d
17, 26 (Tex. 2002).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20B21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).

In proceedings to terminate the parent‑child relationship
brought under section 161.001 of the family code, the petitioner must establish
one ground listed under subdivision (1) of the statute and must also prove that
termination is in the best interest of the child.  TEX. FAM. CODE ANN. ' 161.001
(Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

 








A.     Standard of Review 

Termination of parental rights is a drastic remedy and is of such
weight and gravity that due process requires the petitioner to justify
termination by clear and convincing evidence. 
TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).








In reviewing the evidence for legal sufficiency in parental
termination cases, we must determine whether the evidence is such that a
fact-finder could reasonably form a firm belief or conviction that the grounds
for termination were proven.  In re
J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
fact-finder resolved any disputed facts in favor of its finding if a reasonable
fact-finder could have done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could, and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.

We must therefore consider all of the evidence, not just that which
favors the judgment.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.








In reviewing the evidence for factual sufficiency, we must give due
deference to the fact-finder=s findings and not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d
105, 108 (Tex. 2006).  We must determine
whether, on the entire record, a fact-finder could reasonably form a firm
conviction or belief that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.  If we reverse on
factual sufficiency grounds, then we must detail in our opinion why we have
concluded that a reasonable fact-finder could not have credited disputed
evidence in favor of its finding.  J.F.C.,
96 S.W.3d at 266B67.

B.     Conduct Findings

In his first point, David complains that the evidence is legally
insufficient to support the trial court=s three findings under section 161.001(1)(D), (E), and (N) of the
Texas Family Code.[4]








We first consider whether the evidence was legally sufficient to
support the finding that David engaged in conduct or knowingly placed D.F. with
persons who engaged in conduct that endangered the physical or emotional
well-being of D.F.  See Tex. Fam. Code Ann. ' 161.001(1)(E).  TDFPS
argues that while imprisonment, alone, is insufficient to demonstrate
endangerment, it is a factor to be considered along with other evidence
regarding David=s past drug
use, his three convictions, and his current arrest warrant for possession of
methamphetamine to demonstrate a continuing course of conduct that has had the
effect of endangering D.F.=s well-being. David argues, however, that the evidence regarding his
history of criminal conduct and his 180 days of imprisonment is insufficient to
support a finding that he endangered D.F.=s well-being because it does no more than show that David left D.F. Aadrift in the world.@  See In re T.H., 131
S.W.3d 598, 604 (Tex. App.CTexarkana 2004, pet. denied) (rejecting argument that mere
imprisonment or the commission of an act that results in imprisonment leaves
the child Aadrift in
the world,@ and thus,
constitutes endangerment.).

AEndanger@ means more
than a threat of metaphysical injury or the possible ill effects of a
less-than-ideal family environment.  Boyd,
727 S.W.2d at 533.  The term means to
expose to loss or injury, to jeopardize. 
Id.  The relevant inquiry
is whether evidence exists that the endangerment of the child=s physical or emotional well‑being was the direct result of the
parent=s conduct, including acts, omissions, or failures to act.  Tex.
Fam. Code Ann. ' 161.001(1)(E);  In re J.T.G., 121 S.W.3d 117, 125
(Tex. App.CFort Worth
2003, no pet.).








Termination under section 161.001(1)(E) must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  In
re R.W., 129 S.W.3d 732, 738 (Tex. App.CFort Worth 2004, pet. denied); In re K.M.M., 993 S.W.2d 225,
228 (Tex. App.CEastland
1999, no pet.).  However, it is not
necessary that the conduct be directed at the child or that the child actually
suffer injury.  Boyd, 727 S.W.2d
at 533.  The specific danger to the child=s well-being may be inferred from parental misconduct standing
alone.  See id.; R.W.,
129 S.W.3d at 738. 

Mere imprisonment, alone, does not constitute a course of conduct that
endangers the emotional or physical well-being of a child, but it is a factor
to be considered in the determination.  See
Boyd, 727 S.W.2d at 533B34.  As a general rule, conduct
that subjects a child to a life of uncertainty and instability endangers the
physical and emotional well-being of a child. 
R.W., 129 S.W.3d at 739. 
Drug use and its effect on a parent=s life and his ability to parent may establish an endangering course
of conduct.  Id.  Further, evidence of an inappropriate sexual
relationship with a minor may also be considered in determining if the parent
engaged in conduct that endangered the emotional or physical well-being of the
child.  Id.

While the evidence does not illustrate the daily activities that David
and D.F. shared together, David=s testimony provides the strongest context for their interaction.  David stated that for the first three years,
he and D.F. were together nearly every day. 
He also said that after the first three years, Yvonne ended David=s visitation with D.F.  David
last saw D.F. in August 2004.








We first look to David=s criminal history to determine whether it supports the endangerment
finding.  The evidence shows that in
2003, David was convicted of possession of stolen goods, and in either 2003 or
2004, he was convicted for the assault of his sister.  David testified that his sister hit him with
a baseball bat and that he pushed her away; he could not recall whether his
sister was also convicted of assault. 
David was imprisoned for fifty-five days following the assault
conviction.  Both of these crimes were
committed during or around the time David and D.F. maintained substantial
contact; however, while in California, David was convicted of the felony
offense of unlawful sex with a minor. 
The minor was a seventeen-year-old girl who he claimed lied to him about
her age.  David testified that he Atook a plea@ on the
charge so that he could work and pay child support.

David served probation for nearly two years for the unlawful sex with
a minor conviction, which precluded him from leaving California and visiting
D.F.  David stated that he served
seventy-five days in jail by choice to shorten the total probation period.  While the evidence does not specifically show
how much time David served for each offense, David testified that since 2004,
he has served a total of 180 days in prison.








David admitted at trial that he had an active warrant out for his
arrest in California for possession of methamphetamine, which occurred in
September 2006, after he found out that CPS had custody of D.F.  David stated that if he were to be convicted
of this offense, it would be his second felony offense in California.  He asserted that he was neither using nor
selling methamphetamine but that the police charged him with the offense
because his girlfriend=s
methamphetamine pipe was on his side of the vehicle.

Although imprisonment is insufficient, by itself, to support an
endangerment finding, the court was entitled to consider David=s 180 days=
imprisonment and his probation in its determination.  Further, though not all of David=s misconduct occurred during his time with D.F., the court could have
determined that his actions, which began in North Carolina and continued
through his time in California and after he found out about D.F.=s situation with CPS, constituted a deliberate course of conduct that
had the effect of endangering D.F.=s well-being.  See R.W.,
129 S.W.3d at 738, 743B44. (holding
that the appellant endangered the child under 161.001(1)(E) based mainly on
conduct that occurred before the child=s birth and despite the fact that he never had custody of the child at
any time other than one hour of supervised visitation per week).








The court could have also considered the evidence of David=s admitted past drug use around the time he was connected with D.F. to
support its finding.  When asked whether
he was using drugs during a specific period of time in those first three years
of contact with D.F., David said that he Aprobably was.@  David stated that he last used drugs three
years agoCaround 2004Cwhich was the last time he spent with D.F.  Gillinger testified that part of the reason
she concluded that it was in D.F.=s best interest to terminate the parental rights of all three parents
was due to drug use.  Later, when asked
whether she had any personal knowledge that David abused drugs, Gillinger said,
Aother than records from North Carolina for CPS, no.@  The court=s function, as the trier of fact, is to judge the credibility of the
witnesses, assign the weight to be given their testimony, and resolve any
conflicts or inconsistencies in the testimony.  R.W., 129 S.W.3d at 742.  Thus, the court was entitled to believe that
David had not quit using drugs in light of his active arrest warrant in
California for methamphetamine possession. 
See id. at 742B43.








We also find it pertinent that David failed to act when informed of
CPS=s involvement with D.F.  First,
Michael=s mother informed David that a social service organization in Texas
was investigating Yvonne and D.F., and David responded by attempting to call
Yvonne=s mother and making one phone call to Dallas before giving up
completely on any search for D.F.  David
points to no evidence that would suggest that he did anything more to check on
D.F.=s welfare.  Indeed, when asked
what other efforts he had made to locate D.F. following the conversation with
Michael=s mother, he said, Anone.@  Morever, David found out in August 2006[5]
that CPS had taken custody of D.F., and since that time, he has failed to keep
in touch with Gillinger to inform CPS of his whereabouts, which Gillinger
claimed precluded her from implementing the service plan for David.  David=s failure to act when his daughter=s welfare was clearly in jeopardy is evidence that demonstrates a
conscious omission to act, which has the effect of endangering D.F. by
subjecting her further to a life of instability.

The evidence presented demonstrates a deliberate course of conduct
from which a reasonable trier of fact could have found an endangerment to D.F.=s emotional and physical well-being. 
Specifically, the court could have relied on evidence presented with
respect to David=s failure to
act, drug use, physical violence toward a family member, imprisonment,
probation, and sexual misconduct with a minor to support its finding that David=s actions subjected D.F. to a life of uncertainty and
instability.  Thus, when viewing all the
evidence in the light most favorable to the judgment, we hold that the evidence
was legally sufficient to support the court=s finding that David has engaged in a deliberate course of conduct
that has endangered D.F.=s
well-being.








Because we have found the evidence legally sufficient to support the
trial court=s finding
under subsection (E), we need not address David=s complaint regarding the sufficiency of the findings under
subsections (D) and (N).  See R.W.,
129 S.W.3d at 744 (holding that only one finding under section 161.001(1) is
necessary to support a judgment of termination).

C.     Best Interest Finding

In his second point, David argues that the evidence is factually
insufficient to support the finding that the termination of his parental rights
was in D.F.=s best
interest.  Although David at one time
said that he wanted to care for D.F., he has now requested that D.F. live with
her godmother, Shelly, in North Carolina. 
David argues that it is in D.F.=s best interest to live with Shelly because she would be close to her
siblings, who live in Wake Forest, North Carolina, approximately twenty minutes
away from Shelly=s house.








Prompt and permanent placement of the child in a safe environment is
presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include (1) the desires of the child; (2) the
emotional and physical needs of the child now and in the future; (3)the
emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking
custody; (7) the stability of the home or proposed placement; (8) the acts or
omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley v. Adams,
544 S.W.2d 367, 371B72 (Tex.
1976).

These factors are not exhaustive; some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.








With respect to the first factor, D.F. did not testify at trial, but
Gillinger testified that every time she and D.F. talked, D.F. had positive
things to say about her foster family. 
Most importantly, D.F. told Gillinger not to take her away from her
foster home.  Gillinger also stated that
during their conversations, D.F. talked about her older sister with the foster
family, her involvement with school basketball, her success in school, and
having new friends.  Pamela testified
that D.F. signs her schoolwork with her foster surname and that her school
teachers also refer to her by that name. 
D.F. also refers to Pamela as her Amommy.@

As for the third factor, the court was entitled to conclude, based on
all the evidence set forth above regarding David=s criminal history, drug use, incarceration, and general lack of
interest in D.F.=s life, that
D.F.=s emotional well-being in the future is at risk.

With respect to the fifth factor, Gillinger testified that she had set
up a service plan for David but that she had not implemented the plan because
she had limited contact with David.








Regarding the sixth and seventh factors, CPS plans to have Pamela
adopt D.F.  Pamela testified that adopting
D.F. is also her intention, pending the outcome of the case.  Pamela lives with her husband, their
12-year-old son, and now, D.F.  Pamela
and her husband have three other adult children that live out of the
house.  The evidence demonstrates that
during her time with Pamela, D.F. has both bonded with the family and
successfully acclimated to her new life. 
William Allanach, a Child Advocates volunteer, testified that on his
visits to see D.F. with her new foster family, he noticed that their relationship
seemed to be very loving and supportive, referencing many of the activities
D.F. has enjoyed with her new family, such as riding bicycles, playing
basketball, and baking cookies. Gillinger testified that she noticed a strong
level of affection between D.F. and her new foster family and went on to state
that she did not observe that same level of affection between D.F. and her
previous foster family.








David, on the other hand, has proposed that D.F. leave her foster
family and move in with Shelly in North Carolina, whom D.F., at the time of
trial, had not seen in over two years. 
Shelly lives in a four-bedroom home with her husband and six children;
D.F. would be the seventh child in the house. 
David=s main
argument for placing D.F. with Shelly, is that she would be closer to her
siblings, whom she had not seen in almost two years at the time of trial.  There was a considerable amount of testimony
concerning Shelly and her withdrawal from a previous home study initiated by
North Carolina CPS.  Gillinger testified
that North Carolina CPS denied the home study after it had made several
attempts to contact Shelly and because Shelly failed to participate in foster
parenting classes.  Shelly testified that
her home study was withdrawn, as opposed to being denied by CPS, because she
wanted to give Yvonne=s mother a
chance to take custody of D.F.  Shelly
also mentioned in her reasoning for withdrawing from the home study that her
daughter was expecting a baby and that Shelly felt as though she was the only
one who could be there with her at that time. 
Shelly=s
eighteen-year-old daughter and that daughter=s nine-month-old baby whom Shelly referred to are both currently
living in Shelly=s house.








Regarding the eighth and ninth factors, there is ample evidence that
demonstrates David=s lack of
interest in visiting D.F, knowing her whereabouts, or generally participating
in her life.  David admitted that he did
nothing more than make two phone calls when he first found out that Yvonne and
D.F. were being investigated in either October or November 2005.  Also, since either spring of 2006 or August
2006, when he found out that D.F. was in foster care, David has never visited
D.F. or asked to visit D.F.; however, until late 2006, David was precluded by
the terms of his probation from leaving the state of California.  David also admitted that April 8, 2005 was
the last time he sent any financial support to Yvonne for D.F.  David continued, however, to give money to
Yvonne=s mother for the other three children. 
David testified that he stopped paying child support for D.F. because he
did not know where Yvonne was and that Yvonne did not want the money anyway.  Additionally, the one time that David
traveled by bus through Texas on his way from California to North Carolina, he
failed to make any contact at all with D.F., who was living in Texas at the
time.  He said that it Anever crossed [his] mind@ to call and ask to see D.F. and that he Afigured it was just waiting to go to court.@  Finally, David agreed on
cross-examination that it would be okay if his rights were terminated as long
as D.F. was sent to live with Shelly and that he would not visit D.F. if asked
not to do so by the trial court.

Having carefully reviewed the record and considering the evidence
supporting the Holley factors, we hold that the evidence is factually
sufficient to support the trial court=s best interest finding.  The
trial court could have formed a firm conviction or belief, based on the
evidence set forth above, that terminating David=s parental rights was in D.F.=s best interest.  Accordingly,
we overrule David=s second
point.

V. Conclusion 

Having
overruled both of David=s
points, we affirm the trial court=s judgment.

 

 

PER CURIAM

 

PANEL F: 
HOLMAN, WALKER, and MCCOY, JJ.

 

DELIVERED: 
March 27, 2008

 

 

 

 

 

 

 

 

 

 











[1]See Tex. R.
App. P. 47.4.





[2]Allen
testified that there had been a previous case at some point, in which Yvonne
had been referred to Family Services, but as she recalled, the case was closed
because Yvonne moved back to North Carolina.





[3]David
testified that he called Gillinger in September 2006 to discuss the date of the
hearing for this case, which conflicts with Gillinger=s
testimony stating that the two talked twice in August, but not in September.  It is not clear from the record whether this
second phone call that David testified to is the same second phone call that
Gillinger referred to as being made in August. 
In any event, after the two initial conversations, Gillinger attempted
to call David in September with no success.





[4]In his motion for new trial and in
his brief on appeal, David phrases his first point as a challenge to the legal
sufficiency of evidence regarding the best interest finding under section
161.001(2) of the Texas Family Code.  However,
in the argument section of his brief under this first point, David actually
challenges the legal sufficiency of the conduct findings under section
161.001(1).





[5]Gillinger testified that David was
aware that D.F. was in foster care in spring of 2006, but David testified that
he found out that D.F. was in care of CPS in August 2006, when Gillinger first
contacted him.