**Opinion issued December 6, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00647-CV

———————————

## IN THE INTEREST OF A.K.T., A CHILD

———————————

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-03858J**

———————————

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

---

[1]    *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

A.K.T.[2]  In two issues, mother contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed A.K.T. to remain, in conditions or surroundings which endangered her physical and emotional well-being;[3] she engaged, or knowingly placed A.K.T. with persons who engaged, in conduct that endangered her physical and emotional well-being;[4] and termination of mother's parental rights is in the best interest of A.K.T.[5]

We affirm.

## Background

On July 24, 2017, the Department of Family and Protective Services ("DFPS") filed an "Original Petition for Protection of a Child for Conservatorship[] and for Termination in [a] Suit Affecting the Parent-Child Relationship," seeking termination of mother's parental rights to A.K.T. and managing conservatorship of the child.

---

[2]  At the time of trial, A.K.T. was two years old.  The record indicates that mother has another, younger child who was also removed from her care but is not involved in this appeal.

  The trial court also terminated the parental rights of A.K.T.'s father.  Although he is not a party to this appeal, his conduct is relevant.

[3]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (Vernon Supp. 2018).

[4]  *See id.* § 161.001(b)(1)(E).

[5]  *See id.* § 161.001(b)(2).

At trial, the trial court, over mother's hearsay objection, admitted into evidence, the affidavit, which had been attached to DFPS's original petition, of DFPS Investigator Je'Nae Bailey.[6] Bailey testified that on May 27, 2017, DFPS received a report that A.K.T., who was thirteen months old at the time, had been physically abused by mother. Mother was using "psychotropic medication" that had not been prescribed for her, and she engaged in "erratic behavior" while caring for A.K.T. Mother's "erratic behavior" caused "purple bruising" on A.K.T.'s face. And DFPS ultimately removed A.K.T. from mother's care because there was "continuous domestic violence" between mother and father in the home and mother's "psychiatric condition" posed an "immediate danger" to A.K.T.

On June 2, 2017, when Bailey arrived at mother's home to conduct her initial interview with mother and father, mother tried to leave in a car with A.K.T. without a car seat for the child. Father told Bailey that mother was "off of her meds" and "psychotic." Mother accused father of lying and stated that he was physically abusive toward her and they had a "history of domestic violence." Mother and father then engaged in a series of "volatile arguments" and cursed at each other. Bailey telephoned law enforcement officers to report a domestic disturbance. After law enforcement officers arrived, they were able to separate mother and father, and Bailey proceeded to interview mother.

---

[6] Mother has not challenged the trial court's ruling on appeal.

During her interview, mother stated that she had a "psychiatric condition," but "couldn't get her medication." She explained that "when things [would] escalate between herself and [father], she [would] remove[] herself and [A.K.T.] from the situation" and she took "a sleeping pill one night after she hadn't slept for a few days." Results of mother's narcotics-use testing showed that she was not taking any of her medications at that time. During his interview, father stated that he believed mother to be "taking other people's medications and off [of] her own medication."

On July 20, 2017, father contacted Bailey, stating that he and mother were living together, they had had an argument, and he had left the home with A.K.T. Mother followed father and A.K.T. to a bus stop, where she threatened to telephone law enforcement officers and report that he had "hit her across her face with his cast on his arm." Father stated that mother had actually "hurt herself while getting out of the [bath]tub" and she was "off [of] her medication and . . . talking to herself."

When Bailey went to mother's home later that day, she heard mother cursing and screaming at father inside the home. Mother and father then "brought their screaming session outside," but "neglected to realize" that A.K.T. had "walk[ed] out behind them wearing only a diaper." When they "went back into the house arguing, [A.K.T.] followed." Bailey "could hear loud bangs coming from the house" and could see mother and father "screaming in each other's face in the doorway." When father walked outside to Bailey's car, mother followed him, cursing at him and

4

screaming. After father brought A.K.T. to Bailey, mother "directed her aggression" toward her and approached Bailey's car "with her hands in a fist." Bailey then telephoned law enforcement officers because mother's aggressiveness had increased.

After law enforcement officers arrived, mother became "increasingly volatile." Father granted Bailey permission to take A.K.T. to the DFPS office, and mother "became aggressive" with the officers. Later, a law enforcement officer telephoned Bailey to tell her that mother "became violent with the officers and she was . . . transported to [the] Neuro Psychiatric Center (Ben Taub, Psychiatric Hospital)."[7]

---

[7] The trial court admitted into evidence several Houston Police Department ("HPD") reports about the incident, stating that mother "became very upset when [A.K.T.] was removed from her custody by [DFPS]. She was extremely irate and would not listen to [law enforcement] officers." And she "show[ed] a disregard for the safety of [father]," with whom she lived. While officers attempted to calm mother down, she "repeated 'fuck you!' many times" and shoved father to the ground, "stating that it was his fault [that A.K.T.] was being taken." When officers told mother that she "could go to jail" for shoving father, mother stated "I'll punch him in the motherfucking face! I don't give a shit about no laws!" (Internal quotations omitted.) Mother continued to scream, and father's presence "seemed to fuel her anger."

Law enforcement officers had difficulty placing mother in handcuffs, and she continued to scream "profanities" at officers. Mother also tried to prevent officers from escorting her to a patrol car. While mother was in the backseat of the patrol car, she purposefully "banged her head" against and kicked the partition.

Father told law enforcement officers that mother had been diagnosed with bipolar disorder and was not taking her medication. Father reported that mother would "often become[] irate and belligerent with him."

5

Bailey further testified that her investigation of A.K.T.'s family revealed that mother had been arrested in January 2017 for assault. And father had been previously convicted of the following criminal offenses: aggravated sexual assault, evading arrest, manufacture or delivery of a controlled substance,[8] possession of a controlled substance,[9] prostitution,[10] delivery of marijuana, criminal trespass, possession of marijuana, and assault against a family member.

DFPS caseworker Scarlet Vargas testified that A.K.T. entered the care of DFPS after allegations arose that the child had been physically abused and neglected. At the time, mother was "going through some emotional behaviors," not taking her medication, "taking psychotropic medication" that had not been prescribed for her, and engaging in violent behavior toward father. A.K.T. also had bruising on her face. And in November 2017, mother was hospitalized at a psychiatric hospital.

According to Vargas, mother received a Family Service Plan ("FSP"), which required her to complete a substance-abuse assessment, psychological assessment, parenting classes, and domestic-violence classes. Mother was also required to provide proof of housing and submit to random narcotics-use testing. Mother completed her domestic-violence and parenting classes, her psychological

---

[8]    Father had been twice convicted of this criminal offense.

[9]    Father had been thrice convicted of this criminal offense.

[10]   Father had been twice convicted of this criminal offense.

6

evaluation, and her substance-abuse assessment. Following her substance-abuse assessment, mother was required to attend both individual- and group-counseling sessions. Although mother attended some individual-counseling sessions, she, in May 2018, told her counselor that she no longer wanted to participate.[11] Mother provided a lease agreement for her current apartment, which also listed father on the agreement. And she maintained contact with Vargas throughout the case.

In regard to narcotics use, Vargas noted that mother did not submit to a required narcotics-use test in 2017, and in March 2018, she tested positive for morphine and codeine use. However, she provided copies of prescriptions for those drugs.[12] In September 2017, father tested positive for cocaine use; in November 2017, he tested positive for tramadol use, for which he did not have a prescription; and in March 2018, he tested positive for cocaine and alcohol use.[13]

---

[11]    The trial court admitted into evidence therapy notes from mother's counseling sessions.

[12]    The trial court admitted into evidence mother's narcotics-use testing reports, revealing that she tested negative for narcotics use on June 5, 2017, August 1, 2017, and September 12, 2017. Mother did not appear for her required narcotics-use testing on November 28, 2017. And she tested positive for morphine and codeine use on March 8, 2018.

[13]    The trial court admitted into evidence father's narcotics-use testing reports, revealing that he tested negative for narcotics use on March 3, 2017 and August 1, 2017. He tested positive for cocaine use on September 12, 2017, tramadol use on November 28, 2017, and cocaine and alcohol use on March 8, 2018.

In regard to criminal history, Vargas testified that mother, in 2010, had been convicted of the criminal offense of indecency with a child.[14]  In 2016, father had been convicted of assault of a family member, namely mother.[15]  This assault occurred five days after A.K.T. had been born.  Father had also been convicted of "possession of cocaine, marijuana[,] and prostitution."[16]

In regard to mother, Vargas noted that she had been diagnosed with "bipolar anxiety," depression, and post-traumatic stress disorder ("P.T.S.D."), and she had

---

[14]  *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (Vernon Supp. 2018) (second-degree felony).  In 2015, mother had been charged with theft.  *See id.* § 31.03(a) (Vernon Supp. 2018).

[15]  *See id.* § 22.01(a) (Vernon Supp. 2018) (assault); *see also* TEX. FAM. CODE ANN. § 71.003 (Vernon 2014).

[16]  The trial court admitted into evidence father's criminal record, revealing that he had been convicted of, on May 12, 2016, the misdemeanor offense of assault of a family member; on July 30, 2012, the felony offense of manufacture or delivery of a controlled substance, namely cocaine; on February 23, 2012, the misdemeanor offense of possession of marijuana; on October 4, 2010, the misdemeanor offense of criminal trespass; on March 24, 2010, the misdemeanor offense of prostitution; on February 26, 2009, the misdemeanor offense of delivery of marijuana; on October 10, 2006, the misdemeanor offense of prostitution; on August 26, 2005, the felony offense of possession of a controlled substance, namely cocaine; on February 14, 2003, the felony offenses of delivery of a controlled substance, namely cocaine, and possession of a controlled substance, namely cocaine; and on March 5, 1999, the misdemeanor offense of evading detention.  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102(3)(D) (Vernon Supp. 2018) (cocaine listed in penalty group 1), § 481.112(a), (b) (Vernon 2017) (manufacture or delivery of substance in penalty group 1), §§ 481.115(a), (b) (possession of substance in penalty group 1), 481.120(a), (b)(2) (delivery of marijuana), 481.121(a), (b)(1) (Vernon 2017) (possession of marijuana); TEX. PENAL CODE ANN. §§ 22.01(a), (b) (assault), 30.05(a), (d)(1) (Vernon Supp. 2018) (criminal trespass), § 38.04(a) (Vernon 2016) (evading arrest or detention), § 43.02 (Vernon Supp. 2018) (prostitution).

been using prescription medications that did not belong to her. Mother also admitted during one of her individual-counseling sessions that she had left A.K.T. alone at home while she went shopping. Vargas explained that mother had attended all of her visits with A.K.T., had acted appropriately during the visits, and was "bonded at visits." However, Vargas opined that mother had not learned or benefitted from the services that had been provided to her by DFPS.

Vargas further opined that mother continued to be a danger to the well-being of A.K.T. because she did not understand how her history of mental illness affected her ability to parent her child. Mother needed to work on her issues related to her mental illness in order to be "a good parent," and Vargas opined that mother was "in denial." Vargas also opined that father was a danger to the well-being of A.K.T. because he had continued to test positive for narcotics use during the instant case, had not completed any of the requirements of his FSP, and had an extensive criminal history. According to Vargas, mother and father, at the time of trial, were still involved in a relationship together, but father did not show any interest in A.K.T. Vargas noted that if A.K.T. was returned to the care of mother, the child would be returning to a home environment that included narcotics use and domestic violence. And mother had not demonstrated that she could provide a safe and stable home for her child.

9

In regard to A.K.T., Vargas explained that she is currently placed with her younger sibling, who was born to mother during the pendency of the instant case. A.K.T. is doing well and has bonded with her foster parents and her sibling. Vargas opined it is in the best interest of A.K.T. for mother's parental rights to be terminated and for her to remain with her sibling in her current safe and stable placement.

Child Advocates Inc. ("Child Advocates") volunteer Jennifer Daly testified that A.K.T. is happy, doing well, and well-adjusted in her current placement with her younger sibling. A.K.T. is "well cared for" and bonded with her sibling. And Daly opined that it is in the best interest of A.K.T. for her to remain in her current placement and for that placement to adopt her "if it's possible."

Daly opined that mother had not demonstrated that she had made "any lifestyle changes" since A.K.T. entered the care of DFPS. Mother had "a serious history of mental illness" and did not have a support system.[17] And she could not "maintain her [required] medication regimen." According to Daly, mother had been diagnosed with bipolar disorder, which resulted in hallucinations and delusions, major depressive disorder, and P.T.S.D. Mother "claim[ed] that she [would] get[] very depressed and [would] want[] to stay in bed all day," reported a "history of

---

[17] Mother's therapy notes from a May 15, 2018 counseling session, admitted into evidence, state that she reported that "she does not go out" and "just stays in [her] house because she does not want to be sociable." "She does not like talking about herself and getting to know others," and she would prefer to "stay to herself."

10

self[-]harm," and "had two psychiatric hospitalizations" in the past year. Mother's P.T.S.D. caused "maladaptive behaviors," and she would become physically aggressive toward others.[18]

Daly further opined that mother's parental rights should be terminated because she continued to not maintain a proper medication regimen and she "suffer[ed] from . . . anger outbursts" that she was "not able to control."[19] According to Daly, there was no evidence that mother was stable enough, mentally and emotionally, to care for A.K.T., nothing indicated that would likely change in the future, and A.K.T. "would be at a significant risk for physical and emotional abuse" if she was returned to the care of mother.

Daly concluded that mother and father were still in a relationship together because they had both attended a visit with A.K.T. two weeks prior to trial. Daly noted that mother's "anger outbursts" and father's own P.T.S.D. created an "extremely volatile situation" when they were together. And A.K.T. had "been caught in the crosshairs" of mother and father's relationship in the past.

Mother's FSP, admitted into evidence, states that A.K.T. was removed from a "domestic violence environment," where both mother and father "used some form

---

[18]  Mother's therapy notes from a May 1, 2018 counseling session, admitted into evidence, state that she was "open to work on some issues," but she did not understand "that her mental health issues c[ould] be directly related to not dealing with her past."

[19]  Daly noted that in the past, mother had stopped taking her medication altogether.

of violence toward each other while [A.K.T.] was around."[20] Mother and father both had a criminal history. And mother "tussled" with a law enforcement officer who was present at the scene when A.K.T. was removed from mother's care. Mother also had a "history of taking psychotropic medication," and father had neglected to protect A.K.T. when mother would have "a psychiatric episode." After DFPS removed A.K.T. from her care, mother was "escorted to a psychiatric hospital." And there was concern that mother could not protect A.K.T.

Mother's FSP required her to do the following: participate in domestic-violence classes; refrain from participating in criminal activity; refrain from participating in and interacting with people who had a history of narcotics use or abuse; complete a substance-abuse assessment and follow the recommendations of the assessment; attend all court hearings, permanency-conference meetings, and family visits; submit to random narcotics-use testing and test negative at all times; participate in and complete parenting classes; participate in a psychological evaluation and follow all recommendations; maintain and provide proof of stable and safe housing; maintain contact with A.K.T. and attend visits; and maintain stable employment and provide proof of said employment.

---

[20]    The FSP further states that on one occasion neither mother nor father noticed that A.K.T. had followed them out of their home while they were arguing.

12

A "Permanency Report," from June 2018 and admitted into evidence, states that on May 27, 2017, DFPS received a report of physical abuse of A.K.T. by mother. Mother, at the time, was using "psychotropic medication" that had not been prescribed to her and engaging in "erratic behavior" while caring for A.K.T. As a result of mother's "erratic behavior," A.K.T. sustained "purple bruising" on her face.

The report notes that mother had completed her substance-abuse assessment and attended three out of twelve substance-abuse counseling sessions. Mother, however, did not complete her psychological assessment, parenting classes, or domestic-violence classes. She also did not provide proof of employment, but did provide a lease agreement containing both her name and father's name.

The report further states that mother did not submit to her required narcotics-use testing on December 12, 2017, December 29, 2017, January 19, 2018, January 30, 2018, February 9, 2018, February 17, 2018, April 24, 2018, and April 13, 2018. On March 26, 2018, mother tested positive for codeine use.[21] Father did not submit to his required narcotics-use testing on December 12, 2017, December 29, 2017, January 19, 2018, February 9, 2018, February 17, 2018, April 13, 2018,

---

[21] Mother tested negative for narcotics use on June 5, 2017 and March 8, 2018.

and April 24, 2018. On September 12, 2017, father tested positive for cocaine use, and on March 8, 2018, he tested positive for cocaine use and alcohol use.[22]

In regard to A.K.T., the report states that she was two years old and had been placed in a "[f]oster/adopt" home. Speech therapy had been recommended for the child, and DFPS recommended that she remain in her current placement.

Mother's "Substance Abuse Assessment," admitted into evidence, states that, in October 2017, mother was twenty-one years old. She reported that she was in a "common-law marriage," which had resulted in one child, A.K.T., and she was pregnant with a second child. Mother stated that she had "a mental illness" and "got in argument[s]" with father. At one point, she left her child "home alone" while she went to a store or mall. Mother had previously used prescription medications that had belonged to her mother, and she admitted to using illegal narcotics and medication without a doctor's prescription. Mother reported that she was living by herself and was not "hanging-out with friends that use[d] drug[s] or alcohol."

Mother reported minimal narcotics use and "alcohol use on occasion[]." At one point, she stated that she had "never" used illegal narcotics, but she "sometimes overdosed on [prescription medications]" or used her mother's prescription medications. The counselor who completed the substance-abuse assessment,

---

[22] Father tested negative for narcotics use on November 28, 2017, March 3, 2018, and March 26, 2018.

however, opined that mother was being "dishonest" when he stated that she had "never" used illegal narcotics. And the counselor further opined that mother did not understand the risks involved with using prescription medications or illegal narcotics while caring for a child. In regard to her criminal history, mother explained that she had been "arrested for assaulting [a] police officer," had spent "hours" in "jail" because of it, and was still paying the resulting fine. (Internal quotations omitted.)

The "Substance Abuse Assessment" further notes that mother had good communication skills and "seem[ed] interested in resolving" her DFPS case and "staying clean and sober." She also wanted to care for A.K.T. However, mother appeared to struggle with "positive decision making," which had caused A.K.T. to be removed from her care.

A Houston Police Department ("HPD") report, admitted into evidence, states that on October 25, 2017, law enforcement officers were dispatched to mother's home because of a family disturbance. Upon arrival, mother told the officers that she was "mentally challenged," "not taking [her] medication," and six months pregnant with A.K.T.'s younger sibling. Mother stated that she had tried to leave the home, but father had prevented her from doing so. And she told the officers that "she had been assaulted before," but she was "not in crisis" and her and father "were just having an argument." Father told the officers that he and mother had had an

argument and when she told him that she wanted to leave the home, "he started to help her pack her things."

A Pasadena Police Department ("PPD") report, admitted into evidence, states that on January 2, 2017, law enforcement officers were dispatched to a hospital emergency room after a "[d]isturbance" between mother and father "became physical." According to the report, father had been taken to the hospital but had ultimately refused treatment which upset mother. Mother then began yelling, and when she became more upset, she was escorted outside. While outside, she pushed father, and he pushed her back. A Harris County Sheriff's Office ("HCSO") deputy at the hospital then intervened. When mother was placed in handcuffs, she screamed and repeatedly told law enforcement officers to take the handcuffs off. She was arrested and transported to jail, but ultimately not charged with assault.

Mother testified that she and father had "issues" and they would argue "[o]nce every week." During their arguments, they would "hit each other," and law enforcement officers had been called on four occasions.[23] On one occasion when law enforcement officers came to the scene, mother became upset with an officer who "g[ot] in [her] face." She admitted that she had been arrested four times and

---

[23] Mother's therapy notes from the May 15, 2018 counseling session state that she reported that she "ha[d] been through a lot of emotional issues" and she is emotionally "trigger[ed]" by "people and things that g[o]t on her nerves such as [people who] hound[ed] her to complete things [that] she kn[ew] [that] she ha[d] to get done."

domestic violence had occurred in her home.[24] And mother stated that she was not living with father as he had moved out of her home three months prior to trial.[25] However, father's name was on her lease agreement.

Mother explained that she had previously used prescription medication that belonged to her mother because she could not get her own medication and she and her mother were taking "the same medication at the time."[26] And she continued to take her mother's prescription medication for "a month or two."[27]

---

[24] Mother's therapy notes from the May 1, 2018 counseling session state that she reported that she had met father when "she was living on the streets and was struggling with kidney failure." She stated that her and father had had an argument and he telephoned DFPS, as he had done "numerous times." Father would telephone law enforcement officers whenever she would "attempt[] to get away from him and calm down."

Further, when A.K.T. was removed from her care, mother "lost it" and "refused" to let DFPS "take her child." She fought with law enforcement officers and was put "in the pysch ward." Mother stated that she would only act like that when "people [would] severely piss her off." She was "sweet and kind unless pushed further."

[25] Mother's therapy notes from the May 15, 2018 counseling session, which occurred a month before trial, state that mother reported that father "ha[d] been disappearing for days and *coming home* dirty." (Emphasis added.)

[26] Mother's therapy notes from a December 5, 2017 counseling session, admitted into evidence, state that she reported that she had taken her mother's medication because "she thought it would be okay because [they were] . . . diagnosed with the same mental illness."

[27] Mother's therapy notes from the May 1, 2018 counseling session state that she reported that "she was not currently on her meds."

However, mother's therapy notes from the May 15, 2018 counseling session state that she reported that she "ha[d] been tak[ing] her own medications" and she "underst[ood] that she was not supposed to take her mother's medications."

In regard to A.K.T., mother stated that she had attended every visit with the child, and during those visits, she would bring A.K.T. "something to eat" and "something to do." Her visits with A.K.T. went well. According to mother, she never left A.K.T. home alone while she went to a store or mall.

## Standard of Review

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights."

*Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact

could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

**Sufficiency of Evidence**

In two issues, mother argues that the trial court erred in terminating her parental rights to A.K.T. because the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed A.K.T. to remain, in conditions or surroundings which endangered her physical and

emotional well-being; she engaged, or knowingly placed A.K.T. with persons who engaged, in conduct that endangered her physical and emotional well-being; and termination of her parental rights is in the best interest of A.K.T. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (b)(2) (Vernon Supp. 2018).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### *Endangering Conduct*

In a portion of her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights under section 161.001(b)(1)(E) because she "only tested positive for drugs once," "[s]he provided copies of prescriptions for . . . the[] drugs," and "[t]his isolated

act . . . does not suggest repeated behavior or conduct creating the possibility that [she] will be impaired while caring for [A.K.T.] at any time."

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed [a] child with persons who engaged in conduct which endangers the physical or emotional well-being of the child" and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (b)(2). Within the context of subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose a child to loss or injury or to jeopardize her emotional or physical health. *Id.* (internal quotations omitted); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment was the direct result of the parent's conduct, including acts, omissions, and failures to act. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). It is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child

relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (neglect, even in absence of physical abuse, may endanger child's physical or emotional well-being). The specific danger to a child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the child and she suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). And courts may consider parental conduct that did not occur in a child's presence, including conduct before the child's birth and after she was removed by DFPS. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617.

Here, the evidence shows that mother has a significant history of engaging in violent and abusive conduct directed toward A.K.T., father,[28] and other individuals, including a DFPS employee and law enforcement officers. When A.K.T. was thirteen months old, DFPS received a report that the child had been physically

---

[28] To the extent there are discrepancies in the record about the current relationship status of mother and father, i.e., whether they were still involved in a relationship together at the time of trial, we note that the trial court, as the fact finder, is "the sole judge of the credibility of the witnesses and the weight to give their testimony." *See Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (appellate court may not weigh witness's credibility because it depends on appearance and demeanor which are within domain of trier of fact). And the trial court may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). It is also free to believe or disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony. *In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.).

abused by mother. Mother, at the time, was using "psychotropic medication" that had not been prescribed for her, and she engaged in "erratic behavior" while caring for A.K.T. Mother's "erratic behavior" caused "purple bruising" on A.K.T.'s face.

When DFPS Investigator Bailey arrived at mother's home to conduct her initial interview with mother and father, mother tried to leave with A.K.T. Father told Bailey that mother was "off of her meds" and "psychotic." Mother accused father of lying and stated that father was physically abusive toward her and they had a "history of domestic violence." Mother and father then engaged in a series of "volatile arguments" and cursed at each other. Bailey telephoned law enforcement officers to report a domestic disturbance. And when law enforcement officers arrived, they separated mother and father.

On another subsequent occasion, father contacted Bailey to tell her that he and mother, who were living together, had had an argument, and he had left the home with A.K.T. Mother followed father and A.K.T. to a bus stop, where she threatened to telephone law enforcement officers and report that he had "hit her across her face with his cast on his arm." Father stated that mother had actually "hurt herself while getting out of the [bath]tub" and she was "off [of] her medication and . . . talking to herself."

When Bailey went to mother's home later that day, she heard mother cursing and screaming at father inside the home. Mother and father then "brought their

24

screaming session outside," but "neglected to realize" that A.K.T. had actually followed them. When they "went back into the house arguing, [A.K.T. again] followed." Bailey "could hear loud bangs coming from the house" and could see mother and father "screaming in each other's face in the doorway." When father walked outside to Bailey's car, mother followed him, cursing at him and screaming. After father brought A.K.T. to Bailey, mother "directed her aggression" toward her and approached Bailey's car "with her hands in a fist." Bailey telephoned law enforcement officers because mother's aggressiveness had increased.

After law enforcement officers arrived, mother became "increasingly volatile" and "aggressive" with the officers. Because mother "became violent with the officers," she was "transported to [the] Neuro Psychiatric Center (Ben Taub, Psychiatric Hospital)." And A.K.T. was removed from mother's care that day.

An HPD report about the incident states that mother "became very upset when [A.K.T.] was removed from her custody by [DFPS]. She was extremely irate and would not listen to [law enforcement] officers." And she "show[ed] a disregard for the safety of [father]." While officers attempted to calm mother down, she "repeated 'fuck you!' many times" and shoved father to the ground. When officers told her that she "could go to jail" for shoving father, she stated "I'll punch him in the motherfucking face! I don't give a shit about no laws!" (Internal quotations

25

omitted.) Mother continued to scream, and father's presence "seemed to fuel her anger."

Law enforcement officers had difficulty placing mother in handcuffs that day, and she continued to scream "profanities" at officers. Mother also tried to prevent officers from escorting her to a patrol car. While mother was in the backseat of the patrol car, she purposefully "banged her head" against and kicked the partition. Father reported to law enforcement officers that mother would "often become[] irate and belligerent with him."[29]

Notably, these are not the only violent and abusive incidents in which mother has been involved. An HPD report states that on October 25, 2017,[30] law enforcement officers were dispatched to mother's home because of a family disturbance. Upon arrival, mother told the officers that she was "mentally challenged," "not taking [her] medication," and six months pregnant with A.K.T.'s younger sibling. Mother stated that she had tried to leave the home, but father had prevented her from doing so. And she told the officers that "she had been assaulted before," but her and father "were just having an argument."

---

[29]    During the May 1, 2018 counseling session, mother reported that when A.K.T. was removed from her care, she "lost it" and "refused" to let DFPS "take her child." She fought with law enforcement officers and was put "in the pysch ward." Mother stated that she would only act like that when "people [would] severely piss her off." She was "sweet and kind unless pushed further."

[30]    This incident occurred after the birth of A.K.T.

26

A PPD report states that on January 2, 2017,[31] law enforcement officers were dispatched to a hospital emergency room after a "[d]isturbance" between mother and father "became physical." According to the report, father had been taken to the hospital, but had ultimately refused treatment which upset mother. She then began yelling, and when she became more upset, she was escorted outside. While outside, mother pushed father, and he pushed her back. A HCSO deputy at the hospital then intervened. When mother was placed in handcuffs, she screamed and repeatedly told law enforcement officers to take the handcuffs off. She was arrested and transported to jail.

Further, mother testified generally that she and father had "issues" and they would argue "[o]nce every week." During their arguments, they would "hit each other," and law enforcement officers had been called on four occasions.[32] On one occasion when law enforcement officers came to the scene, mother became upset with an officer who "g[ot] in [her] face." She admitted that she had been arrested four times and domestic violence had occurred in her home.[33]

---

[31]    This incident also occurred after the birth of A.K.T.

[32]    During her May 15, 2018 counseling session, mother reported that she "ha[d] been through a lot of emotional issues" and she is emotionally "trigger[ed]" by "people and things that g[o]t on her nerves such as [people who] hound[ed] her to complete things [that] she kn[ew] [that] she ha[d] to get done."

[33]    During her May 1, 2018 counseling session, mother reported that she had met father when "she was living on the streets and was struggling with kidney failure." She stated that her and father had had an argument and he telephoned DFPS, as he had

DFPS caseworker Vargas similarly testified that mother had engaged in violent behavior toward father. And father had been convicted of assault of a family member, namely mother.[34] Further, Child Advocates volunteer Daly testified that mother's mental health issues caused her to become physically aggressive toward others and experience "anger outbursts" that she was "not able to control."

Vargas opined that if A.K.T. was returned to the care of mother, the child would be returning to a home environment that contained domestic violence. And Daly opined that A.K.T. "would be at a significant risk for physical and emotional abuse" if she was returned to the care of mother. Daly characterized the relationship of mother and father as "extremely volatile" and noted that A.K.T. had "been caught in the crosshairs" of mother and father's relationship in the past.[35]

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d at 739. A parent's abusive or violent conduct can produce an

---

done "numerous times." Father would telephone law enforcement officers whenever she would "attempt[] to get away from him and calm down."

[34] *See* TEX. PENAL CODE ANN. § 22.01(a) (assault); *see also* TEX. FAM. CODE ANN. § 71.003. The assault occurred five days after the birth of A.K.T.

[35] Further, mother's FSP states that A.K.T. was removed from a "domestic violence environment," where both mother and father "used some form of violence toward each other while [A.K.T.] was around." In fact, on one occasion, neither mother nor father noticed that A.K.T. had followed them out of their home while they were arguing. Further, mother and father both had a criminal history. And mother "tussled" with a law enforcement officer who was at the scene when A.K.T. was removed from her care.

environment that endangers the child's well-being. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet); *see also D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child."). While direct physical abuse clearly endangers a child, domestic violence, want of self-control, and a propensity for violence may also be considered as evidence of endangerment. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *16 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re J.I.T.P.*, 99 S.W.3d at 845; *see also In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (considering parent's lack of self-control and propensity for violence and aggression).

Moreover, courts have routinely considered evidence of parent-on-parent physical abuse in termination cases without requiring evidence that the conduct result in a criminal conviction. *See In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.) (parent physically abused child's other parent); *Spangler v. Tex. Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 260 (Tex. App.—Waco 1998, no pet.); *see also In re DC*, No. 01-11-00387-CV, 2012 WL 682289, at *9–10 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. denied) (mem. op.)

29

(parent's testimony other parent physically and mentally abused her supported parental termination under subsection (E)); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (evidence of how parent treated other parent relevant). And evidence that a parent has engaged in abusive or violent conduct in the past permits an inference that she will continue her violent behavior in the future. *Jordan v*, 325 S.W.3d at 724.

Additionally, mother has a significant history of mental health issues and a failure to take proper measures to treat them. For instance, DFPS caseworker Vargas testified that mother was diagnosed with "bipolar anxiety," depression, and P.T.S.D., and she had a history of taking prescription medications that did not belong to her. Similarly, Child Advocates volunteer Daly testified that mother had "a serious history of mental illness" and had been diagnosed with bipolar disorder, which resulted in hallucinations and delusions, major depressive disorder, and P.T.S.D. According to Daly, mother "claim[ed] that she [would] get[] very depressed and [would] want[] to stay in bed all day," reported a "history of self[-]harm," and "had two psychiatric hospitalizations" in the past year. And mother's P.T.S.D. caused "maladaptive behaviors." Daly further noted that mother could not "maintain her [required] medication regimen."

Further, when DFPS initially became involved with A.K.T. and mother, it was because mother had been using "psychotropic medication" that had not been

prescribed for her, and she engaged in "erratic behavior" while caring for A.K.T., which resulted in the child being injured. A.K.T. was removed from mother's care because mother's "psychiatric condition" posed an "immediate danger" to the child. After DFPS became involved with the mother and A.K.T., father reported to DFPS Investigator Bailey that mother was "off of her meds," "taking other people's medications," "psychotic," and "talking to herself." And when A.K.T. was removed from her care, mother was "transported to [the] Neuro Psychiatric Center (Ben Taub, Psychiatric Hospital)" by law enforcement officers.[36]

Mother testified that she had previously used prescription medication that belonged to her mother because she could not get her own medication and she and her mother were taking "the same medication at the time."[37] She continued to take

---

[36]  Mother's FSP states that she had a "history of taking psychotropic medication" and father had neglected to protect A.K.T. when mother would have "a psychiatric episode." And after DFPS removed A.K.T. from her care, mother was "escorted to a psychiatric hospital."

Mother's "Substance Abuse Assessment" states that she admitted that she had "a mental illness," had previously used prescription medications that belonged to her mother, and had used medication without a doctor's prescription. Mother also reported that she had "sometimes overdosed on [prescription medications]." The counselor who completed mother's substance-abuse assessment opined that mother did not understand the risks involved with using prescription medications while caring for a child.

[37]  During the December 5, 2017 counseling session, mother reported that she had taken her mother's medication because "she thought it would be okay because [they were] . . . diagnosed with the same mental illness."

31

her mother's prescription medication for "a month or two."[38]  And Vargas opined that mother continued to be a danger to the well-being of A.K.T. because she did not understand how her history of mental illness affected her ability to parent the child.

A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child.  *Jordan*, 325 S.W.3d at 723–24; *see also In re R.W.*, 129 S.W.3d at 739; *In re J.I.T.P.*, 99 S.W.3d at 845; *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) ("[W]hen a parent's mental state allows h[er] to engage in conduct which endangers the physical and emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").  A parent's failure to properly take medication to treat her mental health issues may also endanger a child's emotional or physical well-being.  *See In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Untreated mental illness can expose a child to endangerment . . . ."); *In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (parent's failure to take medication to treat mental health issues endangered child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d at 845 (parent's mental health and

---

[38]  During the May 1, 2018 counseling session, mother reported that "she was not currently on her meds.

noncompliance with her medication schedule relevant to determining endangerment). And a parent's failure to appreciate the need for treatment to combat her history of mental instability allows a fact finder to infer that her mental health issues would likely recur and further jeopardize a child's well-being in the future. *In re S.R.*, 452 S.W.3d at 367; *In re R.W.*, 129 S.W.3d at 741.

Additionally, we note that illegal narcotics use and its effect on an individual's ability to parent may constitute an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re A.A.M.*, 464 S.W.3d at 426–27. And illegal narcotics use creates the possibility that a parent will be impaired or imprisoned, and thus, incapable of parenting, supporting termination of parental rights under subsection E. *In re A.A.M.*, 464 S.W.3d at 426–27; *Walker*, 312 S.W.3d at 617–18; *see also In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.– Waco Jan. 14, 2016, no pet.) (mem. op.) ("A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.").

Here, mother failed to submit to her required narcotics-use testing on numerous occasions during the course of the instant case. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled screenings indicated she avoided testing because she had used narcotics). And the counselor that completed

her substance-abuse assessment opined that mother was being "dishonest" when she reported that she had "never" used illegal narcotics. Mother did report, during her substance-abuse assessment, that she had "sometimes overdosed on [prescription medications]" and had used illegal narcotics. Further, we note that father has an extensive history of narcotics use and continued to test positive for narcotics use during the instant case. *See In re K.K.D.B.*, No. 14-17-00302-CV, 2017 WL 4440546, at *9 (Tex. App.—Houston [14th Dist.] Oct. 5, 2017, pet. denied) (mem. op.) ("A parent endangers her child by accepting endangering conduct of other people."); *see also In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (parent endangers child by allowing child to have "continued exposure to the other parent's uncontrolled drug habit"). Vargas noted that if A.K.T. was returned to the care of mother, the child would be returning to a home environment that included narcotics use.

Moreover, mother and father both have a criminal history,[39] which for mother includes a conviction, in 2010, of the criminal offense of indecency with a child.[40]

---

[39] Between March 5, 1999 and May 12, 2016, father was convicted of eleven criminal offenses, with the majority of those criminal convictions occurring more recently. *See In re K.K.D.B.*, No. 14-17-00302-CV, 2017 WL 4440546, at *9 (Tex. App.— Houston [14th Dist.] Oct. 5, 2017, pet. denied) (mem. op.) ("A parent endangers her child by accepting endangering conduct of other people.").

[40] *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (second-degree felony).

Mother was also charged with theft[41] in 2015, and she was arrested and transported to jail in January 2017.[42] Mother's "Substance Abuse Assessment" notes that she admitted to being "arrested for assaulting [a] police officer" and she spent "hours" in "jail" because of it. And mother testified that she had been arrested four times.

"[E]vidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of [a] child." *In re S.R.*, 452 S.W.3d at 360–61; *see also In re A.A.M.*, 464 S.W.3d at 426–27 (criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence"). Although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment. *In re T.M.*, No. 14-14-00948-CV, 2015 WL 1778949, at *4 (Tex. App.—Houston [14th Dist.] Apr. 16, 2015, no pet.) (mem. op.); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (recognizing parent's imprisonment demonstrated deliberate course of conduct qualifying as endangering conduct). "An environment which routinely subjects a

---

[41]     *See id.* § 31.03(a).

[42]     The PPD report for the incident states that law enforcement officers were dispatched to a hospital emergency room after a "[d]isturbance" between mother and father "became physical." During the incident mother pushed father, and he pushed her back. When mother was placed in handcuffs, she screamed and repeatedly told the officers to take the handcuffs off.

child to the probability that she will be left alone because her parent[] [is] once again jailed . . . endangers both the physical and emotional well-being of a child." *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Finally, we note that Vargas testified that mother admitted to leaving A.K.T., who was less than two years old at the time, alone at home while she went shopping. And mother's "Substance Abuse Assessment" notes that she reported that she had left A.K.T. "home alone" while she went to a store or mall.

Parental neglect can be as dangerous to the well-being of a child as direct physical abuse. *See In re M.C.*, 917 S.W.2d at 269–70 (noting parent left child alone); *In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *6 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.). And a parent's failure to protect or supervise her young child endangers the child's physical or emotional well-being. *See In re M.C.*, 917 S.W.2d at 269–70; *In re A.D.M.*, No. 01-16-00550-CV, 2016 WL 7368075, at *8 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, pet. denied) (mem. op.) (parent endangered one-year-old child by leaving her home alone).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother engaged, or knowingly placed A.K.T. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See* TEX. FAM. CODE ANN.

36

§ 161.001(b)(1)(E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother engaged, or knowingly placed A.K.T. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother engaged, or knowingly placed A.K.T. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See id.*

We overrule this portion of mother's first issue.[43]

### *Best Interest of Child*

In her second issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of A.K.T. because she is bonded with A.K.T., she has attended every visit, she wants "custody of her child," she "would be given a modified FSP upon restoration of her parental rights," she denied leaving A.K.T. "alone at home," her need for "a psychiatric evaluation" "does not suggest that her relationship with

---

[43] Having held that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E), we need not address the remaining portion of mother's first issue in which she challenges the trial court's finding under Texas Family Code section 161.001(b)(1)(D). *See In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. R. APP. P. 47.1.

[A.K.T.] is improper in anyway," "the desire[] of [A.K.T.] would be to remain in her mother's life," and it is "speculative whether [A.K.T.'s] physical and emotional needs will be met" in her current placement and "whether [A.K.T.'s current placement] will continue to be safe and stable."

A strong presumption exists that a child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, the best interest analysis evaluates the best interest of the child, not the parent. *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).

In determining whether the termination of mother's parental rights is in the best interest of A.K.T., we may consider several factors, including: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination

of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The same evidence of acts and omissions used to establish grounds for termination under section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647.

At the time of trial, A.K.T. was two years old; she was a year old when DFPS removed her from mother's care. Although there is no evidence of her expressed desires in the record, DFPS caseworker Vargas and Child Advocates volunteer Daly testified that she is doing well in her current placement with her foster parents and her sibling. A.K.T. is "well cared for," her current placement is safe and stable, and she is bonded with her foster parents and her sibling. The "Permanency Report" from June 2018 states that A.K.T. had been placed in a "[f]oster/adopt" home and DFPS recommended that she remain in the placement. *See In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex. App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires). When a child is too young to express her desires, a fact finder may consider evidence that the child is bonded with her foster family, receiving good care in the current

placement, and has spent minimal time with a parent.[44]  *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In regard to the current and future emotional and physical needs of A.K.T. and the current and future emotional and physical danger to her, the record shows that when A.K.T. was thirteen months old, DFPS received a report that she had been physically abused by mother.  Specifically, mother was using "psychotropic medication" that had not been prescribed for her and she had engaged in "erratic behavior" while caring for A.K.T.  And mother's "erratic behavior" caused "purple bruising" on A.K.T.'s face.

As previously detailed, mother has an extensive history of engaging in violent and abusive conduct directed toward A.K.T., father, and other individuals, including a DFPS employee and law enforcement officers.  *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence of past misconduct . . . can be used to measure a parent's future conduct."); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases."); *see also In re P.M.B.*, No. 01-17-00621-CV,

---

[44]  We note that mother has attended all of her visits with A.K.T., and DFPS caseworker Vargas opined that she was "bonded at the visits."  However, this is not dispositive of the best-interest analysis.  *See, e.g., In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.).

40

2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (parent's aggressive and hostile behavior throughout case supported best-interest finding); *In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.—Fort Worth 2006, no pet.) (considering parent's violent tendencies in determining current and future emotional and physical danger to children).

Mother's violent conduct has caused her to be arrested and "jail[ed]" on more than one occasion. According to mother, she has been arrested four times and law enforcement officers had been called four times in response to violence occurring between mother and father.[45] *See In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *12 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (considering parent's criminal record in determining present and future emotional and physical danger to children); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (considering parent's criminal history in determining present and future emotional and physical danger to children); *see also In re R.W.*, 129 S.W.3d at 739 ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child.").

---

[45] Further, in 2010, mother was convicted of the criminal offense of indecency with a child, and in 2015, she was charged with theft.

41

Mother also has a significant history of mental health issues and a failure to take proper measures to treat them. During the pendency of the instant case, mother was hospitalized at a psychiatric hospital. And Child Advocates volunteer Daly testified that mother "had two psychiatric hospitalizations" in the past year. Daly further noted that mother "claim[ed] that she [would] get[] very depressed and [would] want[] to stay in bed all day," reported a "history of self[-]harm," and exhibited "maladaptive behaviors," including physical aggression toward others and "anger outbursts" that she could not control. A.K.T. was ultimately removed from mother's care because of the "continuous domestic violence" between mother and father in the home and mother's "psychiatric condition" posed an "immediate danger" to A.K.T.

DFPS caseworker Vargas opined that mother continued to be a danger to the well-being of A.K.T. because she did not understand how her history of mental illness affected her ability to parent her child. And mother needed to work on her issues related to her mental illness in order to be "a good parent." *See In re S.A.G.*, No. 2-09-125-CV, 2010 WL 1006301, at *9 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (parent's thoughts of suicide and depression hindered ability to care for children's needs and posed emotional and physical danger to children now and in future); *In re J.I.T.P.*, 99 S.W.3d at 845 ("[T]he trial court could have considered [parent's] mental state as endangering [the child's] well-being."); *In re*

42

*C.D.*, 664 S.W.2d at 853 ("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows h[er] to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").

Moreover, Daly opined that mother had not demonstrated that she had made "any lifestyle changes" since A.K.T. entered the care of DFPS and mother did not have a support system.[46] Daly opined that mother, who had stopped taking her medication in the past, was not stable enough, mentally and emotionally, to care for A.K.T., nothing indicated that would likely change in the future, and A.K.T. "would be at a significant risk for physical and emotional abuse" if she was returned to the care of mother. *See In re J.D.*, 436 S.W.3d at 118 ("A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future."); *In re C.A.J.*, 122 S.W.3d 888, 893–94 (Tex. App.—Fort Worth 2003, no pet.) ("Without stability, . . . [parent] is unable to provide for the child's emotional and physical needs.").

---

[46] During her May 15, 2018 counseling session, mother reported that "she does not go out" and "just stays in [her] house because she does not want to be sociable." "She does not like talking about herself and getting to know others," and she would prefer to "stay to herself."

Further, it is undisputed that father had been violent and abusive toward mother in the past, had a significant criminal history, and continued to use narcotics throughout the pendency of the instant case.[47] *See In re K.K.D.B.*, 2017 WL 4440546, at *9 ("A parent endangers her child by accepting endangering conduct of other people."). Daly described the relationship between mother and father as "extremely volatile." And the record indicates that mother and father had both "used some form of violence toward each other while [A.K.T.] was around."

Moreover, Vargas noted that if A.K.T. was returned to the care of mother, the child would be returning to a home environment that included narcotics use and domestic violence, and Vargas opined mother had not demonstrated that she could

---

[47] We also note that mother refused to submit to required narcotics-use testing on numerous occasions during the pendency of the instant case. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled screenings indicated she avoided testing because she had used narcotics); *see also In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (considering parent's refusal to take court-ordered narcotics test in analyzing emotional and physical danger to children). Further, during her substance-abuse assessment, mother reported that she had "sometimes overdosed on [prescription medications]" and used illegal narcotics. *See also In re T.L.S.*, 2012 WL 6213515, at *6 (considering parent's narcotics use in analyzing present and future emotional and physical danger to children); *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.) (parent's narcotics use considered in determining current and future emotional and physical danger to children). The counselor that completed mother's substance-abuse assessment opined that mother was "dishonest" when she also reported that she had "never" used illegal narcotics. And the counselor opined that mother did not understand the risks involved with using prescription medications or illegal narcotics while caring for a child.

provide a safe and stable home for her child. *See In re J.S.-A.*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) ("Evidence of domestic violence . . . supports a finding that placement with parent is likely to subject [a] child to emotional and physical danger now and in the future."); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home unable to provide for child's emotional and physical needs); *In re J.I.T.P.*, 99 S.W.3d at 846 (exposure to domestic violence, even when child not intended victim, supports finding termination in child's best interest).

A.K.T., who was two years old at the time of trial, is currently placed with her sibling in a "[f]oster/adopt" home. Her placement is safe and stable and she is bonded with her foster parents and her sibling. A.K.T. is "well cared for," happy, doing well, and well-adjusted. Speech therapy has been recommended for the child, and DFPS recommended that A.K.T. remain in her current placement. *See In re Z.B.*, No. 02-14-00175-CV, 2014 WL 5409103, at *9 (Tex. App.—Fort Worth Oct. 23, 2014, no pet.) (mem. op.) (considering foster family's ability to meet child's physical and emotional needs); *see also In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (emotional and physical needs of young children now and in future are great due to their age).

In regard to mother's parental abilities, DFPS caseworker Vargas testified that mother had attended all of her visits with A.K.T. and acted appropriately during those visits. And mother testified that her visits with A.K.T. went well and she would bring the child "something to eat" and "something to do" at each visit.

However, A.K.T. entered the care of DFPS after it had received a report of physical abuse of the child by mother. And when DFPS Investigator Bailey went to mother's home to interview mother and father, mother tried to leave in a car with A.K.T. without a car seat for the child. On another occasion at mother's home, Bailey saw mother and father screaming at each other outside, while "neglect[ing] to realize" that A.K.T. had followed them out of the home. Further, mother admitted during one of her individual-counseling sessions and during her substance-abuse assessment that she had left A.K.T., who was less than two years old at the time, alone in her home while she went to a store or mall. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by his past conduct).

Child Advocates volunteer Daly opined that mother was not able to mentally and emotionally care for A.K.T. and nothing indicated that would likely change in the future. And DFPS caseworker Vargas opined that mother had not learned or

benefitted from the services that had been provided to her by DFPS.[48] *See In re B.J.*,
2016 WL 13890504, at *12 (parent's inability to provide safe and stable home
relevant to determining parental abilities); *In re J.J.G.*, No. 14-15-00094-CV, 2015
WL 3524371, at *7 (Tex. App.—Houston [14th Dist.] June 4, 2015, no pet.) (mem.
op.) (when determining "[p]arenting [a]bilities," considering "past performance as a
parent").

In regard to the plans for A.K.T. and the stability of her proposed placement,
DFPS caseworker Vargas testified that A.K.T. is placed with her sibling in a foster
home that is safe and stable. A.K.T. is doing well and bonded with her foster parents
and her sibling. Similarly, Child Advocates volunteer Daly testified that A.K.T. is
happy, doing well, and well-adjusted in her current placement. A.K.T. is "well cared

---

[48] The record evidence about mother's violent and abusive conduct, mental instability, failure to properly treat her mental health issues, history of criminal conduct, improper use of illegal narcotics and prescription medication, and relationship with father—an individual with an extensive history of criminal conduct, violent conduct, and narcotics use—is also relevant in determining mother's parental abilities. *See In re S.G.A.R.*, No. 01-18-00291-CV, 2018 WL 4705835, at *6 (Tex. App.—Houston [1st Dist.] Oct. 2, 2018, no pet. h.) (mem. op.) ("Parental substance abuse and past criminal conduct demonstrate poor judgment, which brings into question the parent's ability to provide adequate care for the child."); *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (parent's aggressive and hostile behavior throughout case supported best-interest finding); *In re A.M.*, 495 S.W.3d 573, 581–82 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (relying in part on "history of assaultive conduct between" parents in affirming decision termination of parent's rights in child's best interest); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

for" and bonded with her sibling who is placed with her. And Daly opined that it is in the best interest of A.K.T. for her to remain in her current placement and for that placement to adopt her "if it's possible." Moreover, the "Permanency Report" from June 2018 states that A.K.T. had been placed in a "[f]oster/adopt" home and DFPS recommended that she remain in that placement.[49]

In contrast, although mother testified that she is no longer living with father, he is listed on the lease agreement for her home and both Vargas and Daly opined that mother was still in a relationship with him. Daly explained that mother and father together attended a visit with A.K.T. two weeks prior to trial. And during her counseling session a month before trial, mother reported that father "ha[d] been disappearing for days and *coming home* dirty." (Emphasis added.) The record indicates that if A.K.T. was returned to the care of mother, she would be returning to a home environment that included violence, narcotics use, criminal conduct, and mental instability. *See In re J.D.*, 436 S.W.3d at 119–20 (considering parent's instability and poor judgment); *Adams v. Tex. Dep't of Family & Protective Servs.*,

---

[49] Mother asserts that it is "speculative as to whether [A.K.T.'s current placement] will continue to be safe and stable" and "there is no guarantee that the child will remain safe, stable and protected in the future." However, a "lack of evidence about [specific] definitive plans for permanent placement and adoption" of A.K.T. is not dispositive. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013) (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Rather, we examine the entire record to determine best interest, even where DFPS is "unable to identify with precision the child's future home environment." *In re E.C.R.*, 402 S.W.3d at 250 (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d at 28.

236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest of children).

In regard to acts or omissions that may indicate that the parent-child relationship is not proper, a parent's inability to provide a stable home supports a finding that termination of her parental rights is in the best interest of the child. *In re S.B.*, 207 S.W.3d at 887–88; *see also In re J.S.B.*, 2017 WL 6520437, at *22. Here, there is ample evidence that mother cannot provide a safe and stable home for A.K.T.[50]

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of A.K.T. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of A.K.T. *See id.* We further conclude that the trial court could have reconciled any disputed evidence

---

[50] We also consider the following relevant in determining acts or omissions that may indicate that the parent-child relationship is not proper: mother's decision to leave A.K.T. home alone; her violent and abusive conducted directed at father, A.K.T., and other individuals; her continued relationship with father—an individual with an extensive history of criminal conduct, violent conduct, and narcotics use; her failure to submit to required narcotics-use testing; and her failure to properly treat her mental health issues.

in favor of finding that termination of mother's parental rights is in A.K.T.'s best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of A.K.T.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights is in the best interest of A.K.T.  *See id.*

We overrule mother's second issue.

### Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Massengale.

Massengale, J., concurring in the judgment.